JOHN HABASHY, State Bar No. 236708
633 W. 5th Street, 28th Floor
Los Angeles, CA 90071
Telephone: (877) 529-5090
Facsimile: (888) 373-2107
Email: john@exiconlaw.com

Eric Andrew Mercer, State Bar No. 248707
LAW OFFICE OF ERIC ANDREW MERCER
770 L Street, Suite 950
Sacramento, CA 95814
Telephone: (916) 361-6022
Facsimile: (916) 361-6023
Email: eric@ericmercerlaw.com

Attorneys for Plaintiff, Blaine Turner

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

# LOS ANGELES DIVISION

| | |
|---|---|
| BLAINE TURNER, an individual;<br><br>Plaintiff,<br><br>v.<br><br>BAYVIEW LOAN SERVICING, LLC, MANUFACTURERS AND TRADERS TRUST COMPANY *d/b/a* M&T BANK,<br><br>Defendants. | Case No. 2:18-cv-00542<br><br>**COMPLAINT FOR:**<br><br>1. Violations of the Equal Credit Opportunity Act, 15 U.S.C. §1691(d)(1)<br><br>2. Violations of the Real Estate Settlement and Procedures Act, Regulation X, 12 U.S.C. § 2605(f); 12 C.F.R. § 1024.41<br><br>3. Negligence, Cal. Civ. Code § 1714<br><br>4. Unfair Business Practices, Cal. Bus. & Prof. Code § 17200<br><br>DEMAND FOR JURY TRIAL |

## I. INTRODUCTION

1. Plaintiff, Blaine Turner and his family lived in their home for over 40 years. They have always made their mortgage payments until June 2013. Mr. Turner faced a significant medical illness that caused him fell behind on his mortgage payments. Despite this hardship, Plaintiff continued to make partial payments under a six-month deferral arrangement with Bayview Loan Servicing, LLC. However, the medical issues persisted. Due to the now well-publicized market failures of the loan servicing industry, he could not sell his home as he owed more than the home was worth on the market. This caused him to face only two options: foreclosure or loan modification. Plaintiff attempted to apply for a loan modification only to be subject to years of unconscionable treatment at the hands of Bayview Loan Servicing, LLC, who serially and alternatively provided misinformation, apathy, and inaction in response to Plaintiff's repeated attempts to obtain a loan modification to avoid foreclosure of his family home.

## II. JURISDICTION

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 based on Plaintiff's claims under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(d)(1) and the Real Estate Settlement Procedures Act, 12 U.S.C. § 2605.

3. This Court, alternatively, has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

4. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 to hear and determine Plaintiff's state law claims because those claims are related to Plaintiff's federal law claims and arise out of a common nucleus of related facts. Plaintiff's state law claims are related to Plaintiff's federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

///

2
COMPLAINT

## III.  VENUE

5. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) in that the unlawful conduct that gives rise to these claims occurred within the Eastern District of California.  The Los Angeles Division is the proper division in that the real property that is the subject of this action is located in Los Angeles County, California.

## IV.  PARTIES

6. Plaintiff, Blaine Turner, is, and was at all times mentioned herein was, over the age of 18 and a resident of Los Angeles County, California.  He is domiciled in and is a citizen of California. The real property commonly described as 6278 Day Street, Tujunga, California 91042 ("Subject Property") was, at all relevant times was, Plaintiff's principal and family residence.

7. Defendant Bayview Loan Servicing, LLC ("Bayview") is a limited liability company with its headquarters at 4425 Ponce de Leon Boulevard, 5th Floor, Coral Gables, Florida, 33146. Bayview is a citizen of Florida because its articles of association establish that location as its main office.  Defendant Bayview was, at all times relevant to the allegations in this complaint, acting as the default sub-servicer of Plaintiff's home mortgage loan.

8. Defendant Manufacturers and Traders Trust Company *d/b/a* M&T Bank ("M&T Bank") is a Delaware company with its principal office located at One M&T Plaza, Buffalo, New York.  M&T Bank is a wholly owned subsidiary of M&T Bank Corporation, which is a separate and distinct legal entity from its subsidiaries and receives substantially all of its revenue from subsidiary dividends.  Defendant M&T Bank was, at all times relevant to the allegations in this complaint, acting as holder and master servicer.  *See* 12 C.F.R. § 1024.31 ("Master servicer means the owner of the right to perform servicing. A master servicer may perform the servicing itself or do so through a subservicer. Subservicer means a servicer that does not own the right to perform servicing, but that performs servicing on behalf of the master servicer.").

3
COMPLAINT

9. Plaintiff refers to "Defendants" collectively as including Bayview, and M&T Bank unless the individual defendant is specifically identified.

10. Plaintiff is informed and believe, and on that basis allege, that at all times herein mentioned each of the Defendants was an agent, servant, employee, and/or joint venturer of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

11. Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

12. There is a unity of interest between Defendants, and each acts as the alter ego of the other.

## V. BACKGROUND FACTS

13. On January 10, 2014, the Consumer Financial Protection Bureau ("CFPB"), promulgated a number of new regulations implementing the requirements imposed by the Dodd-Frank Act. The CFPB published a preamble to the rules where it provided an overview of the mortgage servicing market and the market failures the new rules were intended to address.[1]

14. Mortgage servicing is performed by banks, thrifts, credit unions, and non-banks under a variety of business models. In some cases, creditors service mortgage loans that they originate or purchase and hold in portfolio. Other creditors

---

[1] Relevant portions are included here, but the entire preamble is available at: http://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila-preamble.pdf

sell the ownership of the underlying mortgage loan, but retain the mortgage servicing rights in order to retain the relationship with the borrower, as well as the servicing fee and other ancillary income. In still other cases, servicers have no role at all in origination or loan ownership, but rather purchase mortgage servicing rights on securitized loans or are hired to service a portfolio lender's loans.

15. These different servicing structures can create difficulties for borrowers if a servicer makes mistakes, fails to invest sufficient resources in its servicing operations, or avoids opportunities to work with borrowers for the mutual benefit of both borrowers and owners or assignees of mortgage loans. Although the mortgage servicing industry has numerous participants, the industry is highly concentrated, with the five largest servicers servicing approximately 53 percent of outstanding mortgage loans in this country.

16. Compensation structures vary somewhat for loans held in portfolio and securitized loans, but have tended to make pure mortgage servicing (where the servicer has no role in origination) a high-volume, low-margin business.

17. Under this business model, servicers act primarily as payment collectors and processors, and will have limited incentives to provide other customer service. Servicers are generally not subject to market discipline from consumers because consumers have little opportunity to switch servicers. Rather, servicers compete to obtain business from the owners of loans—investors, assignees, and creditors—and thus competitive pressures tend to drive servicers to lower the price of servicing and scale their investment in providing service to consumers accordingly.

18. Servicers also earn revenue from fees assessed on borrowers, including fees on late payments, fees for obtaining force-placed insurance, and fees for services, such as responding to telephone inquiries, processing telephone payments, and providing payoff statements.  As a result, servicers have an incentive to look for opportunities to impose fees on borrowers to enhance revenues.

19. These attributes of the servicing market created problems for certain

borrowers even prior to the financial crisis. For example, borrowers experienced problems with mortgage servicers even during regional mortgage market downturns that preceded the financial crisis. There is evidence that borrowers were subjected to improper fees that servicers had no reasonable basis to impose, improper force-placed insurance practices, and improper foreclosure and bankruptcy practices.

20. [T]he Government Accountability Office (GAO) has found pervasive problems in broad segments of the mortgage servicing industry impacting delinquent borrowers, such as servicers who have misled, or failed to communicate with, borrowers, lost or mishandled borrower-provided documents supporting loan modification requests, and generally provided inadequate service to delinquent borrowers. It has been recognized in Inspector General reports, and the Bureau has learned from outreach with mortgage investors, that servicers may be acting to maximize their self-interests in the handling of delinquent borrowers, rather than the interests of owners or assignees of mortgage loans.

## V. FACTS SPECIFIC TO PLAINTIFF

21. Plaintiff's experience included many of the mortgage servicing market failures identified in the CFPB preamble.

22. Plaintiff was raised in the subject property and has lived there for over 40 years. He became the solely responsible for the property upon his father's death in 2004.

23. On or about January 2011, Mr. Turner refinanced the existing loan to obtain funds to pay for medical expenses related to the care of his dying mother.

24. On or around June 2013, Plaintiff suffered a financial setback and fell behind on his mortgage payments. Despite this hardship, Plaintiff continued making partial payments under a six-month deferral arrangement with his mortgage servicer.

25. During 2013, Plaintiff continued to suffer medical issues, causing him to fall behind on his mortgage payments.

26. On or around January 2014, Mr. Turner received notice that his

mortgage was transferred to Defendants M&T Bank and Bayview.

27. During 2014, Plaintiff applied with Bayview for a loan modification. Plaintiff complied fully with Defendant Bayview's requests and sent in a variety of documentation as requested by Bayview to support Plaintiff's application for a loan modification, including, but not limited to, financial statements, a hardship letter, specific forms and tax returns. Plaintiff provided all requested documentation and regularly communicated with Bayview.

28. On or about July 2014, Plaintiff reached an agreement with Defendant for a loan modification agreement wherein the loan arrearages would be capitalized, and modification would become permanent after three trial payments.

29. Plaintiff made timely trial payments during September, October, and November of 2014.

30. On or about December 5, 2014, Plaintiff received a document dated December 1, 2014 from Defendants, along with modification documents to be signed, notarized, and delivered before December 15, 2014. The letter stated new monthly payment details and timeline of the modification (the "Modification Agreement").

31. On or about December 5, 2014, Plaintiff faxed Defendant a notarized Modification Agreement along with an "explanation of how Bayview's form did not conform to California's notarization requirements." In response, Bayview stated that "what the California notary did was fine."

32. On or about March 3, 2015, Plaintiff filed for Chapter 7 Bankruptcy intending to discharge his unsecured debt and medical bills that had become mounting. Defendants ceased sending payment coupons and refused to accept payment under the loan modification agreement of December 2014.

33. In May 2015, Plaintiff's employer "lost some large customers," and Plaintiff suffered a material change in circumstances.

34. On May 15, 2015, Bayview denied Plaintiff's request for a new loan

7
COMPLAINT

modification based on the change in circumstances. Plaintiff alleges on information and belief that Bayview miscalculated his income in denying him for a new loan modification.

35. On or about June 17, 2015, Plaintiff received a bankruptcy discharge.

36. During August of 2015, Plaintiff contacted Keep Your Home California in an effort to apply for assistance under the Principal Reduction Program.

37. On or about August 14, 2015, Plaintiff received Notice of Default and Election to Sell Under Deed of Trust from the Law Offices of Les Zieve, counsel/trustee for Defendant Bayview Loan and Servicing, LLC.

38. On or about September 11, 2015, Keep Your Home California approval was withdrawn due to insufficient income.

39. On or about October 8, 2015, Plaintiff received notice from Bayview that there was a clerical error in the Modification Agreement. Defendant Bayview sent Plaintiff a "Corrective Agreement."

40. On or around October 12, 2015, Plaintiff received a document from Defendants dated October 8, 2015. Defendants informed Plaintiff that the loan modification documents from 2014 needed to be re-signed. Defendants state "there was an error in the modification agreement document. In order to resolve this you are receiving the attached corrective agreement."

41. On or about October 12, 2015, Plaintiff contact Defendants regarding the received document. A Bayview representative advised Plaintiff to submit a new application for loan modification. The Bayview representative requested information including tax returns, bank statements and a 4506-T form. Defendants advised Mr. Turner to simply "apply for a loan modification." Plaintiff immediately followed the Defendants instructions and sent these documents via facsimile and certified mail on October 12, 2015. Bayview failed to respond in writing within five or thirty days.

42. The first document received from Defendants was a document dated

November 18, 2015 and advised Plaintiff of his new point of contact was Angela John. The document provided contact and fax information but did not state whether his application was complete or incomplete or whether he had been approved or denied for a loan modification.

43. On or about January 18, 2016, Plaintiff received another letter from Angela John with specific instruction to resubmit certain documents he had already provided. Although Plaintiff already submitted the requested documents, he complied immediately and, again, sent Angela John the requested documents on the same day.

44. In a document dated February 8, 2016, Defendants acknowledged receipt of Plaintiffs loan modification application and that they will review and provide a response within 30 days.

45. In a document dated February 11, 2016, Defendants again request additional items from Plaintiff. Specifically, they requested a) Plaintiff sign page 2 of his 2014 tax return, b) Most recent Quarterly or YTD Profit and Loss Statement, and c) two most recent paystubs. The document provides the Plaintiff a deadline of March 21, 2016 to deliver the requested items.

46. On February 16, 2016, Plaintiff faxed Defendants all three documents requested.

47. On or around February 18, 2016, Plaintiff faxed a detailed letter to Defendants verifying foreclosure sale postponement to the March 12 deadline.

48. On February 23, 2016, Defendants authorized the foreclosure sale of the Plaintiff's home.

49. On or around April 5, 2016, Plaintiff received an "Agreement for Surrender of Possession" from DLI Properties, LLC, the Subject Property's new owner. Plaintiff signed the foregoing agreement and was removed from the Subject Property.

50. Plaintiff was put through a gauntlet of obstacles to continue with a

modification application; including multiple and unnecessary requests for the same financial documents and the countless re-routing between bank representatives.

51. Plaintiff has also requested a payment history from Defendant Bayview in order to properly account for their trial payments; however, Bayview has refused to provide one to Plaintiff.

52. Plaintiff is informed and believes, and thereupon alleges, that Defendant Chase, Defendant Bayview and Defendant M & T caused the non-judicial foreclosure sale of the Subject Property on February 23, 2016.

53. Due to the actions of the Defendants and their agents and representatives, Plaintiff has suffered the loss of his home to foreclosure, faced an imminent eviction therefrom, emotional distress, pain and suffering, loss of creditworthiness, and legal expenses, among other damages to be proven at trial.

54. Mr. Turner attempted to obtain a fair review for loan modification from Defendants. Instead, Defendants reacted to Plaintiff's requests with inaction, obfuscation, apathy, and ultimately foreclosure. As a result, Turner suffered emotional distress that caused him to experience anxiety, chronic fatigue, loss of concentration, embarrassment with his family, frustration, feelings of hopelessness, loss of self-confidence, and nervousness.

## VI. CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Violations of the Equal Credit Opportunity Act**
**15 U.S.C. § 1691(d)(1)**
**(Against All Defendants)**

55. Plaintiff realleges each and every allegation above as if fully set forth in this Cause of Action.

56. Plaintiff is an applicant for credit as defined by ECOA, 15 U.S.C. § 1691a(b). Plaintiffs applied for HAMP modifications with Defendants on at least two occasions.

57. At all relevant times herein, Defendants have been a "creditors" as

defined by ECOA, 15 U.S.C. § 1691a(e).

58. 15 U.S.C. § 1691(d)(1) provides that "within thirty days...after receipt of a completed application for credit, a creditor shall notify an applicant of its actions on the application."

59. 12 C.F.R. § 202.9(c) provides that "[w]ithin 30 days after receiving an application that is incomplete regarding matters that an applicant can complete, the creditor shall notify the applicant either: (i) Of action taken, in accordance with paragraph (a) of this section; or (ii) Of the incompleteness, in accordance with paragraph (c)(2) of this section."

60. 12 C.F.R. § 202.2(f) provides that in reviewing an application for completeness, "the creditor shall exercise reasonable diligence in obtaining such information" necessary to decide whether to extend credit

61. Plaintiff's applications for HAMP modifications were "applications for credit" as defined by 15 U.S.C. § 1691a(d) and 12 C.F.R. § 202.2(j).

62. Plaintiff provided Bayview with a completed application for credit on October 12, 2015 and January 18, 2016.

63. Defendants, when they did respond in writing, failed to comply with ECOA.

64. When Plaintiff contacted Defendants, Plaintiff received contradictory responses whether the application had been denied or was still "under review."

65. Defendants' failures to notify Plaintiff of the action taken on two applications for credit within thirty days from receipt of their applications constitute at least two separate substantive violations of ECOA and Defendants' servicing records likely will demonstrate more violations.

66. Plaintiff alleges, on information and belief, that Defendant failed to exercise reasonable diligence in obtaining information from third parties because Defendant failed to properly respond to Plaintiff's applications in accordance with ECOA within a reasonable amount of time.

67. Defendants actions created actual harm or a material risk of harm because Plaintiff was unable to learn where and how her credit status was deficient and/or allow her a chance to rectify misinformation or inadequate information.

68. Plaintiff suffered actual damages including out-of-pocket monetary losses, embarrassment, and mental anguish in the form of anxiety, stress, concern, and worry about the status of her applications and whether he would lose her home to foreclosure; and emotional distress as a result of the foreclosure of his home.

69. 65. As a result of the above ECOA violations, Defendants are liable to Plaintiff for actual damages pursuant to 15 U.S.C. § 1691e(a); punitive damages of $10,000 pursuant to 15 U.S.C. § 1691e(b); and attorney's fees and costs pursuant to 15 U.S.C. § 1691e(d).

**SECOND CAUSE OF ACTION**
**Violations of the Real Estate Settlement Procedures Act; Regulation X, 12 U.S.C. § 2605(f); 12 C.F.R. § 1024.41**
**(Against all Defendants)**

70. Plaintiff realleges each and every allegation above as if fully set forth in this Cause of Action.

71. Under the Real Estate Settlement Procedures Act ("RESPA"), Regulation X, mandates a procedural framework under which the evaluation of loss mitigation options must take place. Reg. X, 12 C.F.R. § 1024.41(a).

72. A servicer has a duty to respond to an application whether or not it is complete. Reg. X, 12 C.F.R. § 1024.41(b)(2). Within five business days after receipt of the application, the servicer must send the borrower a notice acknowledging that the application is complete or provide a written notice to the borrower describing the documents and information needed to complete the application. Reg. X, 12 C.F.R. § 1024.41(b)(2)(i)(B). This incomplete information notice must include a "reasonable date" by which the borrower should submit the missing documents and information. Reg. X, 12 C.F.R. § 1024.41(b)(2)(ii).

73. The evaluation of the borrower for all loss mitigation options must be

completed within thirty days of receipt of a complete application. (Reg. X, 12 C.F.R. § 1024.41(c)(1)(i).

74. 12 C.F.R. § 202.2(f) provides that in reviewing an application for completeness, "the creditor shall exercise reasonable diligence in obtaining such information" necessary to decide whether to extend credit.

75. A servicer shall permit a borrower to appeal the servicers denial of the borrowers for a trial or permanent modification. Within 30 days of a borrower making an appeal, the servicer shall provide a notice to the borrower stating the servicer's determination, by independent evaluation, of whether the servicer will offer the borrower a loss mitigation option based upon the appeal. Reg. X, 12 C.F.R. § 1024.41(h).

76. Regulation X provides that: "If a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice to the borrower pursuant to paragraph (c)(1)(ii) of this section the specific reason or reasons for the servicer's determination for each such trial or permanent loan modification option . . ." C.F.R. § 1024.41(d).

77. Official Bureau Interpretation, Supp. 1 to Part 1024 ¶ 41(d)(2); further provides that: "If a trial or permanent loan modification is denied because of a net present value calculation, the specific reasons in the notice provided to the borrower must include the inputs used in the net present value calculation."

78. Official Bureau Interpretation, Supp. 1 to Part 1024 ¶ 41(d)(1); further provides that: "If a trial or permanent option is denied because of a requirement of an owner or assignee of a mortgage loan, the specific reasons in the notice provided to the borrower must identify the owner or assignee of the mortgage loan and the requirement that is the basis of the denial. A statement that the denial of a loan modification is based on investor requirement, without additional information specifically identifying the relevant investor or guarantor and the specific applicable

requirement, is insufficient."

79. Plaintiff provided Defendants with a request for loan modification in or about October 2015 and January 2016.

80. Defendants failed to evaluate and make a determination on Plaintiff's applications within thirty days and failed to acknowledge that Plaintiffs' application was complete or, alternatively, provide an incomplete information notice within five days as required by Regulation X.

81. Defendants' denial letters, to the extent any were actually mailed, failed to provide all of the inputs used and failed to provide the specific investor requirement that resulted in denial.

82. Defendants failed to provide a notice to Plaintiff of her right to appeal denial of her loan modification application and/or failed to provide an opportunity for Plaintiff to appeal denial of her application for loan modification.

83. Plaintiff alleges on information and belief that Defendants failed to exercise reasonable diligence in obtaining information to complete Plaintiff's applications because Defendants failed to properly respond to loan modification applications in a reasonable amount of time and/or respond to loan modification applications at all.

84. Defendants actions created actual harm or a material risk of harm to Plaintiff's concrete interests in clear and consistent communications in a timely manner because Defendants failed to provide clear and consistent communications in a timely manner and, instead, provided contradictory information, misinformation, and failed to properly review Plaintiffs' loan modification applications in a timely manner ultimately foreclosing on her family home.

85. Plaintiff suffered actual damages including out-of-pocket monetary losses, embarrassment, and mental anguish in the form of anxiety, stress, concern, and worry about the status of the loan modification applications and whether Plaintiff would lose his home to foreclosure.

86. Plaintiff may enforce the provisions of this section pursuant to section 6(f) of RESPA. 12 U.S.C. 2605(f). Under section 6(f), Plaintiff is entitled to actual damages including, but not limited to, out-of-pocket monetary losses, injury to credit reputation, and mental anguish, humiliation or embarrassment and $2,000 in statutory punitive damages due to Defendant's pattern and practice of noncompliance with the requirements of this section. Finally, Plaintiff is entitled to the costs of the action, together with any attorney's fees incurred in connection with this action.

**THIRD CAUSE OF ACTION**
**Negligence**
**California Code of Civil Procedure section 1714**
**(Against all Defendants)**

87. Plaintiff realleges each and every allegation above as if fully set forth in this Cause of Action.

88. Defendants owe a duty of care under California Civil Code section 1714 to Plaintiff because it solicited loan modification applications, communicated with Plaintiff regarding options for loss mitigation, and because Defendants voluntarily undertook review of Plaintiff's applications for loan modification.

89. Defendants breached their duty to Plaintiff by failing to exercise reasonable care when it invited Plaintiff to apply for loan modifications and engaging in a lengthy review process but failing to properly review Plaintiff.

90. Defendants breached their duty to Plaintiff by failing to exercise reasonable care when they failed to provide accurate information about the loan and the modification process for years.

91. Defendants breached their duty to Plaintiff by failing to exercise reasonable care when they failed to properly calculate Plaintiff's income.

92. Defendants breached their duty to Plaintiff by informing Plaintiff that even though there was a foreclosure sale date scheduled on the Subject Property, that the foreclosure has been put on hold while the loan modification application was

being reviewed, while nonetheless advancing the foreclosure sale without Plaintiff's knowledge.

93. As a direct and proximate result of its negligence, Defendants caused damage to Plaintiffs, including but not limited to depriving the opportunity to obtain the requested relief; causing Plaintiff to forego other options for addressing the default and/or unaffordable mortgage payments, injury to credit reputation, costs and expenses incurred to prevent or fight foreclosure, and other damages.

94. Pursuant to California Civil Code section 3333 Plaintiff is entitled to damages in the amount that will compensate for all the detriment proximately caused by Defendants. Since Defendants acted recklessly, with oppression, and/or malice Plaintiffs are entitled to punitive damages in an amount to be determined at trial, pursuant to California Civil Code section 3294.

## FOURTH CAUSE OF ACTION
### Violations of California's Unfair Competition Law
### California Business and Professions Code section 17200
### (Against All Defendants)

95. Plaintiff realleges each and every allegation above as if fully set forth in this Claim.

96. California Business and Professions Code section 17200 et seq. ("Section 17200"), also known as the California Unfair Competition Law ("UCL"), prohibits acts of "unfair competition," including any "unlawful, unfair, fraudulent or deceptive business act or practice" as well as "unfair, deceptive, untrue or misleading advertising."

97. Defendant's conduct was unlawful in that:
    a. It violates the ECOA as described herein, and
    b. it violates RESPA and Regulation X as described herein.

98. Defendants' conduct was unfair in that:
    a. Defendants promised, but failed to complete, review of Plaintiff's application for modification in accordance with HAMP guidelines

        performed its alleged NPV calculations utilizing inaccurate gross income, unpaid capitalized balance, and other inputs and, instead proceeded with a foreclosure on the Subject Property; and

    b. Defendants routinely made false statements, failed to provide meaningful information, and made duplicate requests for information already received.

99. As a direct and proximate result of defendants' unlawful and unfair business practices, Plaintiff has been injured in fact and has lost money or property in that Defendant charged excess interest, late fees, and other fees Plaintiff would not have incurred but for Defendants' excessive delay.

100. As a direct and proximate result of defendants' unlawful and unfair business practices, defendants have been unjustly enriched and should be ordered to make restitution to Plaintiff pursuant to Business and Professions Code sections 17203 and 17204.

101. The unlawful, unfair and fraudulent business practices of Defendants described herein present a continuing threat to Plaintiff and will not cease doing so unless and until forced to do so by this Court. Defendants' conduct is causing and will continue to cause irreparable injury to Plaintiff unless enjoined or restrained.

102. Plaintiff is entitled to restitution and injunctive relief pursuant to Business and Professions Code section 17203.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment against Defendants as follows:

1. For judgment in favor of Plaintiff and against Defendants on all claims;
2. For actual damages according to proof;
3. For statutory damages according to proof but not less than $10,000.00 for violations of ECOA and $2,000.00 for violations of RESPA;
4. For punitive damages;
5. In the alternative to damages, for an order that Defendant be ordered to

make restitution to Plaintiffs pursuant to California Business and Professions Code § 17203;

6. For any award to Plaintiffs of the costs of this action, including the fees and costs of experts, together with reasonable attorney's fees, costs and expenses;

7. For all other relief at law or in equity that Plaintiffs are entitled to by law that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby request a trial by jury as to each and every claim for which they are so entitled.

Dated: January 18, 2018          Respectfully submitted,

By: */s/ John Habashy*
JOHN HABASHY
Attorney for Plaintiff